

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-23-2007

# USA v. Lin

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-4388

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Lin" (2007). *2007 Decisions*. Paper 1579.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1579

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 05-4388

UNITED STATES OF AMERICA

v.

CHANG PING LIN,

Appellant

On Appeal from the United States District Court
for the District of New Jersey
District Court No.: 02-cr-293-01
District Judge: The Honorable Jerome B. Simandle

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 13, 2006

Before: SMITH and ROTH, *Circuit Judges*,
and YOHN *District Judge*[*]

(Filed: February 23, 2007)

OPINION

SMITH, *Circuit Judge*.

Chang Ping Lin ("Lin") was a loan shark who preyed on gamblers in Atlantic City,

---

[*]The Honorable William H. Yohn, Jr., Senior District Judge for the Eastern
District of Pennsylvania, sitting by designation.

1

New Jersey.  He targeted Feng Bin Ho ("Ho"), a construction worker from New York, an illegal immigrant, and a compulsive gambler, eventually kidnaping him and giving rise to this case.

Ho and his girlfriend, Hsin Lan Lin ("Hsin"), met Lin and Lin's girlfriend, Ying Li ("Ying"), in February of 2001, during a gambling trip in Atlantic City.  Ho borrowed $10,000 from Lin at a 10 percent per day interest rate.  Ho lost the money gambling, but was able to repay the loan by taking out a $15,000 bank loan.  Ho and Hsin returned to Atlantic City in February of 2002 for another gambling trip.  Ho promptly lost all the money he had brought with him, as well as all that Hsin was willing to give him.  Ho saw Lin at the Hilton Casino on February 18, 2002.  By the end of the trip on February 23, 2002, Ho owed Lin and his business associate, Kui Lin ("Kui"), approximately $23,000.  Lin and Kui visited Ho's home a few days later and forcibly took up residence there, demanding repayment of the loan.  On March 12, 2002, Hsin provided $4,000 and was informed by Lin that Ho still owed $15,000.  Lin took Ho back to Atlantic City the following day, where Ho lost more money.  Kui then drove Ho back to New York City, continued to stay with him and encourage him to pay back his loan.

On March 14, 2003, Ho telephoned Hsin and asked her to collect $3,500 from a restaurant owner who owed him money for construction work.  Hsin succeeded and gave the money to Ho.  Kui took Ho back to Atlantic City.  On March 16, 2002, Hsin learned that Ho was in Atlantic City.  She drove there and found Ho gambling while Lin watched.  Hsin offered to help Ho repay the loans if Lin and Kui would leave Ho alone and stop

2

lending him money.  They agreed and allowed Ho and Hsin to return to New York City.

Hsin began receiving threatening phone calls from Lin.  Lin informed Hsin that Ho owed

him $38,000.

On March 25, 2002, Lin and Ying came to Ho's home.  They demanded that Ho

get into their car, telling him that they were returning to Atlantic City so that Ho could

win back some of the money.  Ho complied and was taken to a house in Atlantic City

where Lin and Ying rented several rooms.  Lin and Ying took Ho to a third floor

bedroom.  Kui joined them, grabbed Ho by the collar, threw him on the bed, and

instructed him to call family members to raise money.  Ho was unsuccessful.  The

following day, Lin told Ho that if he was unable to raise the money that day, he would be

handed over to a Chinese gang.  Lin also threatened Ho's family in China and claimed

that he would sell Hsin to a brothel.

Ho was locked in the bedroom for 29 hours without food or water.  At

approximately 10:00 pm on the second night, Ho escaped through the bedroom window

while Lin, Ying, and Kui were out getting food.  Ho ran two blocks down the road until

he found a house with the lights on.  He informed the owner that he had been kidnaped

and asked the owner to call the police.  The owner did so.  The police arrived shortly.  Ho

informed them that he had been kidnaped and took them to the house.  The police

searched the house with the landlord's consent.  The police apprehended Lin later that

evening, using Ho's description of Lin's white Lexus.  Ho identified Lin at the scene.

The police arrested Lin, searched his person, and found four I.O.U.s in his wallet,

including one from Ho.

On April 16, 2002, a federal grand jury charged Lin, Ying, and Kui with conspiracy to kidnap, kidnaping, making extortionate extensions of credit, and collection of credit by extortionate means. A jury convicted Lin on all counts. The District Court sentenced Lin to 109 months' imprisonment, in the middle of the applicable U.S. Sentencing Guidelines range of 97 to 121 months. Lin challenged his sentence after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005). This Court granted Lin's request, but affirmed his conviction. At Lin's re-sentencing, the District Court particularly noted Lin's progress in prison in the intervening three years and sentenced him to 100 months' imprisonment. Lin timely appealed.

On appeal Lin makes two arguments. First, he contends that the District Court erred by treating the Guidelines as a "starting point," rather than considering them as one factor among many under 18 U.S.C. § 3553(a). Second, he argues that the District Court acted unreasonably by concluding that a 100 month sentence was the lowest sentence sufficient to accomplish the purposes of punishment. Both these arguments are without merit. We will affirm the judgment of the District Court.[1]

The Supreme Court in *Booker* rendered the federal sentencing guidelines advisory. 543 U.S. 220, 261 (2005). The Court stated that appellate courts should review sentences

---

[1] The District Court exercised jurisdiction pursuant to 18 U.S.C. § 3231. Appellate jurisdiction exists under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). *See United States v. (Lydia) Cooper*, 437 F.3d 324, 327-28 (3d Cir. 2006).

for "reasonableness" in reference to the § 3553(a) factors, but declined to specify what form this review would take. *See* 18 U.S.C. § 3553(a).[2] This Court recently explained its approach in *United States v. (Lydia) Cooper*, 437 F.3d 324 (3d Cir. 2006). *Cooper* dictates that we first inquire whether the District Court gave "meaningful consideration" to the § 3553(a) factors, and then "ascertain whether those factors were reasonably applied to the circumstances of the case." *Id*. at 329-30. The party challenging the sentence bears the burden of showing unreasonableness. *Id*. at 332.

*Cooper* mandates that "[t]o determine if the court acted reasonably in imposing the resulting sentence, we must first be satisfied the court exercised its discretion by considering the relevant factors." *Id*. at 329 (citing *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)). However, "a rote statement of the § 3553(a) factors

---

[2] These factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1);
> (2) the need for the sentence to reflect the seriousness of the crime, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed education or vocational training, medical care, and other correctional treatment in the most effective manner, § 3553(a)(2);
> (3) the kinds of sentences available, § 3553(a)(3);
> (4) the applicable Guidelines sentence, § 3553(a)(4);
> (5) the pertinent policy statements of the Sentencing Commission, § 3553(a)(5);
> (6) the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and
> (7) the need to provide restitution to victims, § 3553(a)(7).

*See United States v. King*, 454 F.3d 187, 194 (3d Cir. 2006).

should not suffice if at sentencing either [litigant] properly raises a ground of recognized legal merit (provided it has a factual basis) and the court fails to address it." *Id*. (internal quotes omitted).

Cooper instructs that the second step in the reasonableness inquiry is to "apply a deferential standard" to determine if the sentencing court reasonably applied the factors to the circumstances of the case. *Id*. at 330. The focus on review is not how the appellate court would have applied the § 3553(a) factors. Rather, the emphasis is on "whether the district judge imposed the sentence he or she did for reasons that are logical and consistent with the factors set forth" in § 3553(a). *Id*. This deferential standard recognizes that "the trial court [is] in the best position to determine the appropriate sentence in light of the particular circumstances of the case." *Id*.

The District Court committed no error by treating the Guidelines as a logical "starting point." Indeed, this Court has often described the Guidelines' correct role in our sentencing jurisprudence with just such language. *See id*. at 331 (stating that the Guidelines "provide a natural starting point for the determination of the appropriate level of punishment for criminal conduct"); *King*, 454 F.3d at 196 ("[W]e emphasize that the sentencing courts in this Circuit should continue to follow the requirement to 'consider' the Guidelines by calculating a Guidelines sentence as they would have before *Booker* . . . ."); *United States v. Vampire Nation*, 451 F.3d 189, 196 (3d Cir. 2006) ("[D]istrict courts, post-*Booker*, exercise broad discretion in imposing sentences, so long as they begin with a properly calculated Guidelines range . . . ."). We have rejected formulations that we

6

believe would accord an inappropriate weight to the Guidelines range, such as presuming that a sentencing court considered the factors or that the resulting sentence was reasonable solely because the sentence fell within the Guidelines range. *See Cooper*, 437 F.3d at 329-31. The District Court committed no error by beginning with a proper calculation of the Guidelines range–indeed, to do otherwise could constitute a wholesale rejection of the Guidelines, which we have held "is *verboten*." *United States v. Gunter*, 462 F.3d 237, 249 (3d Cir. 2006).

Second, Lin argues that the District Court acted unreasonably by concluding that a 100 month sentence was the lowest sentence sufficient to accomplish the purposes of punishment. This Court laid out the contours of this deferential portion of our review in *Cooper*. 437 F.3d at 330 ("[W]e must also ascertain whether those factors were reasonably applied to the circumstances of the case. In doing so, we apply a deferential standard, the trial court being in the best position to determine the appropriate sentence in light of the particular circumstances of the case."). We emphasized in *Cooper* that we should not ourselves weigh the sentencing factors, but inquire simply "whether the district judge imposed the sentence he or she did for reasons that are logical and consistent with the factors set forth in section 3553(a)." *Id*. We repeatedly noted in *Cooper* that a "sentence that falls within the guidelines range is more likely to be reasonable than one outside the guidelines range." *Id*. at 331; *see also id*. at 332. The District Court noted that Lin's background and the circumstances of his crime were not meaningfully different from most who were convicted of his offenses. The Court walked

through each of the sentencing factors, noting both the acute mental suffering of the victim and Lin's apparent failure to contribute to society. The Court noted that, although specific deterrence was not at issue as Lin is almost certain to be deported, the sentence must be adequate to serve the purpose of general deterrence. The Court exercised admirable thoroughness in its discussion of the § 3553(a) factors and in explaining their application to the facts of the case. We can perceive no reason in the briefs or the record that we should hold the District Court's sentence unreasonable. Lin asks us to re-balance the facts of his record—the very task that *Cooper* admonishes us to avoid. We will affirm the judgment of the District Court.